

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37296-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMIE C. PENDLETON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Jamie Christen Pendleton appeals multiple convictions for

identity theft and forgery committed in the course of trying to reopen his business, the

Spokane Daiquiri Factory, after becoming ineligible to hold a liquor license. Jury

instruction on an uncharged means requires us to reverse and remand his forgery

convictions for a new trial, and one of the identity theft convictions is unsupported by

substantial evidence. We reverse Mr. Pendleton's convictions on counts IV, XI, XII and

XIII.  We remand with directions to dismiss count IV with prejudice, for retrial of counts

XI, XII and XIII, and for resentencing on the remaining counts, which we affirm.

FACTS AND PROCEDURAL BACKGROUND

In early 2016, Jamie Christen Pendleton undertook to relicense and reopen a bar in

Spokane, to be operated by Pendleton Enterprises, LLC under the trade name "Spokane

Daiquiri Factory."  Ex. P-5, at 3.  The Daiquiri Factory had previously operated in 2014

from premises in the Crescent Building, for a little under a year.

At the time of the planned reopening, however, Mr. Pendleton was ineligible to

obtain a liquor license.[1]  He was also unemployed.  In need of financial support and a

different licensee, he suggested to Sabrina Thompson, with whom he was romantically

involved, that she help him monetarily and become the owner.  She agreed.  In addition

to providing financial support, she helped him get the business premises cleaned up and

ready to reopen.

Beginning in March 2016, the following steps were taken to relicense and reopen

the bar.  On March 30, a business license application was filed online with the

---

[1] Mr. Pendleton committed grand theft in Idaho in June 2015, for which he was
sentenced in May 2016; the date of his conviction does not appear in the record.
According to a witness from the Washington State Liquor and Cannabis Board who
testified at the trial below, Mr. Pendleton had committed a number of regulatory
violations during the nine months he previously held a Washington liquor license.  His
conviction was not mentioned during the trial below, and testimony about the liquor
violations was stricken.  Several witnesses testified to the fact that he was ineligible to
obtain a liquor license however.

2

Washington State Business Licensing Service by Pendleton Enterprises, LLC.  The

limited liability company (LLC) had been formed in Washington in 2013.  The

application identified Mr. Pendleton's mother, Jacqueline Pendleton, as the LLC's

manager, and identified her address as being on Willow Hearth Drive in Houston, Texas.

It identified Jacqueline[2] as the preparer of the online application.

The application identified Ms. Thompson as a member of the LLC.  It identified as

a second member Mr. Pendleton's then-23-year-old daughter, who shares the name

Jamie, although her middle name is Khrystian, while his is Christen.  We refer to her

hereafter as "Jamie K."  Jamie K. resided in Texas and was estranged from her father,

who she had last spoken to in 2008.  The business license application provided an

accurate social security number for Jamie K., but identified her as living in Post Falls,

Idaho.  Jamie K. had never been to Idaho.  It identified her telephone number as a "208"

area code telephone number that was provided on other licensing and corporate materials

as an after-hours number for Ms. Thompson, a telephone number for Mr. Pendleton, and

a telephone number for the Daiquiri Factory business.[3]

---

[2] Given the involvement of three Pendleton family members, two with a common first name, we refer to the defendant as Mr. Pendleton and to his mother and daughter by their first names, for clarity.  We intend no disrespect.

[3] 208 is an area code in the North American Numbering Plan for Idaho, and was Idaho's sole area code until 2017.  *See Area codes 209 and 986*, WIKIPEDIA (available at https://en.wikipedia.org/wiki/Area_codes_208_and_986).

On April 1, a "Change in Governing People, Percentage Owned and/or Stock/Unit Ownership" form for Pendleton Enterprises was completed and filed with the Business Licensing Service.  It was signed by Mr. Pendleton as "Former Owner/Manager."  It identified the owners of the LLC as Jacqueline, Jamie K. and Ms. Thompson.  It gave a Veradale, Washington, address for Jamie K. and again provided as her telephone number the "208" area code number used elsewhere by the business, Ms. Thompson, and Mr. Pendleton.  The form stated that Mr. Pendleton's removal as owner/manager and the assumption of ownership by the three new members took place on April 1, 2016.

Also completed for Pendleton Enterprises on April 1 was an amended report to the Washington Secretary of State.  Like the change in ownership form, it was signed by Mr. Pendleton as "Former Owner/Manager" and identified Jacqueline, Jamie K., and Ms. Thompson as the LLC's "Governors."  Ex. P-7.  This form listed Jamie K.'s address as the same Houston, Texas, address provided for Jacqueline.

On April 5, Pendleton Enterprises filed a further application online with the Business Licensing Service.  It again identified Jacqueline as the one making the online filing.  This application sought a license to operate a restaurant serving spirits, beer and wine, and paid the associated license fee of $1,700.  Jamie K., Jacqueline, and Ms. Thompson continued to be identified as the governing persons.

To determine whether a business is qualified to receive a liquor license, the Washington State Liquor and Cannabis Board (WSLCB) vets the applicant and each

4

individual within the applying entity.  WSLCB personnel conducted a telephone interview for Pendleton Enterprises' liquor license application on April 27, 2016, and requested additional documentation from the LLC that day and later, in May 2016.

Among the requested documents that Pendleton Enterprises submitted on the same day as the interview was a limited liability company information form.  The form, which certified the accuracy and completeness of the information provided, identified Jacqueline, Jamie K. and Ms. Thompson as the LLC's members.  It was signed "Jacqueline Pendleton."  Ex. P-9.

Also submitted the same day as the interview was a personal/criminal history statement for Jamie K.  The statement identified her then-current address as the same Willow Hearth Drive address in Houston usually provided for Jacqueline.  The statement certified that its contents were true, correct and complete.  Ex. P-10, at 1.  It was signed "Jamie Pendleton."  *Id.*

In May 2016, the WSLCB required a further attestation as to who owned the business and would be involved in "the primary duties of the business."  Report of Proceedings (RP) at 425.  The WSLCB was provided with a consent document form from Pendleton Enterprises and its landlord, FPA Crescent, by the landlord's agent, Red Tail Acquisitions.  The document stated that the principals of the LLC had changed in January 2016; that Jacqueline, Jamie K. and Ms. Thompson were the current principals; that FPA Crescent, by its agent, "approves and consents to the new principals"; and that Pendleton

Enterprises LLC "is the tenant" at the proposed bar location. Ex. P-11. The document appeared to have been signed by Joan Camera, on behalf of the landlord's agent.

Finally, the WSLCB requested and received a consent document from FPA Crescent, addressed to the WSLCB, that "confirm[ed] that Pendleton Enterprises LLC has full and exclusive rights" to the Daiquiri Factory's proposed business location in the Crescent Building. The consent document appeared to have been signed by Curt Lorenz, property manager for FPA's agent. Ex. P-12.

Sometime during the following year it came to light that Jamie K. had no knowledge of having been identified as a member of Pendleton Enterprises and denied that the purported signature on her criminal history statement was hers. Law enforcement identified a bank account with Bank of America in Jamie K.'s name, and a Discover credit card account in Mr. Pendleton's name but using Jamie K.'s social security number, that it believed were opened by Mr. Pendleton. It also came to light that FPA's agent representatives Camera and Lorenz disclaimed any knowledge of the consent and certification forms submitted to the WSLCB over their purported signatures. On April 26, 2017, an information was filed charging Mr. Pendleton with 11 counts of identity theft, 5 counts of forgery, and 1 count of perjury. The charges were amended twice, and Mr. Pendleton was ultimately tried for 10 counts of second degree identity theft, 3 counts of forgery, and 1 count of perjury.

The case proceeded to a six-day trial, during which the State called 12 witnesses. Among them were Ms. Thompson, Jamie K., Ms. Camera and Mr. Lorenz; the State did not call Jacqueline as a witness.

Ms. Thompson testified that after advancing Mr. Pendleton the money he needed to relicense the Daiquiri Factory she was "fairly upset" to find out he had made his mother and daughter owners as well. He sought to placate her with the explanation that they were only "beneficiaries to the company." RP at 159, 165. Ms. Thompson testified that Mr. Pendleton "coordinated all the paperwork to put the business together." RP at 158. When he needed signatures on business paperwork, she testified that he would have her sign first "[a]nd he took care of the rest." RP at 160. She testified that neither Jacqueline nor Jamie K. were involved in operations.

Jamie K. disclaimed any knowledge of the Discover account that Mr. Pendleton opened using her social security number and birth date. She testified that she had once opened an account with Bank of America "a long time ago . . . like when I first got a bank account." RP at 449. But having reviewed the documentation for the Bank of America account that was the subject matter of count IV, Jamie K. denied opening that account or giving anyone permission to open the account in her name. She denied completing or signing the personal/criminal history statement submitted to the WSLCB. She testified that she first learned of the existence of Pendleton Enterprises and the Daiquiri Factory from a Google search of her name that she performed in 2016.

7

Ms. Camera testified that she was familiar with Mr. Pendleton as a tenant of the Crescent Building premises "start[ing] in 2014" and "then he left and then he came back in 2016 for a short time."  RP at 320.  She testified that she did not recognize the landlord consent document provided to the WSLCB that she had ostensibly signed, that the signature on the document was not hers, and that she had not given anyone permission to sign the document on her behalf.

Mr. Lorenz testified that in his management role for the Crescent building, he had "frequently" dealt with Mr. Pendleton in person.  RP at 334.  He testified that the first time he had ever seen the FPA Crescent consent document for the WSLCB that purportedly was signed by him was when it was shown to him by a Spokane police detective.  He testified that he did not create the document, had not given anyone permission to create it, and had not given anyone permission to sign his name to it.

At the close of the State's case, the trial court dismissed three of the counts (two counts of second degree identity theft and one count of perjury) for insufficient evidence. The defense called no witnesses.

The trial court instructed the jury that to find Mr. Pendleton guilty of forgery, it had to find that he "offered or put off as true a written instrument which had been falsely made, completed or altered . . . ."  Clerk's Papers (CP) at 243-45.  This was contrary to the information, which had alleged that Mr. Pendleton, "with intent to injure and defraud,

8

did falsely make, complete and alter a written instrument . . . ." CP at 215. The jury

instruction was in a form proposed by Mr. Pendleton.

The jury found Mr. Pendleton guilty of the following 11 counts submitted for its

decision:

| Count | Date (on or about) | Charge | Instrument or account | Purported signatory |
|---|---|---|---|---|
| III | 1/5/15 – 11/30/15 | 2° identity theft | Discover account | Jamie K. |
| IV | 1/31/16 | 2° identity theft | Bank of America account | Jamie K. |
| V | 3/8/16 | 2° identity theft | Bank of America debit card | Jamie K. |
| VI | 3/30/16 | 2° identity theft | Business Record Application of Filing form | Jamie K. |
| VII | 4/1/2016 | 2° identity theft | Change in Governing People, Percentage Owned and/or Stock/Unit Ownership form | Jamie K. |
| VIII | 4/4/2016 | 2° identity theft | Secretary of State Amended Report | Jamie K. |
| IX | 4/5/2016 | 2° identity theft | Business License Application Record of Filing form | Jamie K. |
| X | 4/27/2016 | 2° identity theft | Limited Liability Company Information form | Jamie K. |
| XIII | 4/27/2016 | Forgery | Personal Criminal History Statement form | Jamie K. |
| XI | 5/24/2016 | Forgery | Landlord Consent Document for Pendleton Enterprises | Joan Camera |
| XII | 5/24/2016 -6/7/2016 | Forgery | FPA Crescent Consent Document for WSLCB | Curt Lorenz |

9

*See* CP at 213-15.

The trial court imposed high end sentences of 57 months for the identity theft counts and 29 months for the forgery counts, to run concurrently.  It ordered Mr. Pendleton to pay community supervision fees, a $500 victim assessment, $200 in court costs, $200 in criminal filing fees, and a $100 Deoxyribonucleic acid collection fee.  The legal financial obligations (LFOs) were imposed despite defense counsel's argument that Mr. Pendleton was indigent.

Mr. Pendleton appeals.

ANALYSIS

I.  MR. PENDLETON'S THREE FORGERY CONVICTIONS REQUIRE RETRIAL

Mr. Pendleton's first two assignments of error are (1) to the trial court's jury instruction on an uncharged means of forgery, and (2) ineffective assistance of trial counsel in proposing the instruction.

"The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution require that an accused be informed of the charges he/she must face at trial."  *State v. Lindsey*, 177 Wn. App. 233, 246-47, 311 P.3d 61 (2013).  "[W]here the statute provides that a crime may be committed in different ways or by different means, it is proper to charge in the information that the crime was committed in one of the ways or by one of the means specified in the statute, or in all the ways."  *State v. Severns*, 13 Wn.2d 542, 548, 125 P.2d 659 (1942).  If only one of the alternatives is

charged in the information, it is error to instruct the jury that it can convict on the basis of the uncharged alternatives. *State v. Bray*, 52 Wn. App. 30, 34, 756 P.2d 1332 (1988) (citing *Severns*, 13 Wn.2d at 548). "Instructing the jury on uncharged alternatives is a manifest error affecting a constitutional right that this court will address for the first time on appeal." *State v. Sanchez*, 14 Wn. App. 2d 261, 267, 471 P.3d 910 (2020).

Forgery is an alternative means crime. *Bray*, 52 Wn. App at 34-35. A person is guilty of the crime of forgery if, with intent to injure or defraud, he or she either "falsely makes, completes, or alters a written instrument," RCW 9A.60.020(1)(a), or "possesses, utters, offers, disposes of, or puts off as true a written instrument which he or she knows to be forged." RCW 9A.60.020(1)(b).

As recounted above, the State's information alleged only one alternative means for the three forgery charges: that Mr. Pendleton "did *falsely make, complete and alter* a written instrument." CP at 147 (emphasis added). Yet the jury was instructed that its duty was to return a verdict of guilty if the State proved that Mr. Pendleton "*offered or put off as true* a written instrument which had been falsely made, completed or altered." CP at 243-45 (emphasis added).

The problematic means language in the instruction was proposed by Mr. Pendleton. The invited error doctrine precludes review of an instructional error—even one of constitutional magnitude—if the challenged instruction was proposed by the defendant. *State v. Doogan*, 82 Wn. App. 185, 188, 917 P.2d 155 (1996) (citing *State v.*

11

*Henderson*, 114 Wn.2d 867, 870, 792 P.2d 514 (1990)). The invited instructional error is not a basis for reversing the convictions.

An ineffective assistance of counsel claim is not foreclosed by invited error, however. *Id.* In order to show counsel was ineffective, the defendant must show "counsel's conduct was deficient and that the conduct resulted in actual prejudice." *Id.* While we strongly presume counsel was not deficient, we may find counsel deficient if counsel had no legitimate tactical reason for an allegedly incompetent act. *Id.* at 188-89. It is clear error to instruct the jury on an uncharged means, so deficient representation is shown.

"'An erroneous instruction given on behalf of the party in whose favor the verdict was returned is presumed prejudicial unless it affirmatively appears that the error was harmless.'" *Sanchez*, 14 Wn. App. 2d at 267 (quoting *Bray*, 52 Wn. App at 34-35). "The error cannot be harmless when the jury possibly convicted the accused on the basis of the uncharged alternative." *Id.* at 268.

The State concedes that the jury would have relied on the incorrect instruction in finding Mr. Pendleton guilty of the three forgery counts. We agree, reverse his convictions on counts XI, XII and XIII, and remand those charges for retrial. Reversal of these three convictions and a fourth, which we reverse below, will reduce Mr. Pendleton's offender score from 11 to 7 and cause his sentences to exceed the standard range. *See* RCW 9.94A.510. Resentencing is required.

12

II.     CHALLENGES TO THE SUFFICIENCY OF THE EVIDENCE

Mr. Pendleton's third and fourth assignments of error are to the sufficiency of the evidence to sustain eight of his convictions. Three are forgery convictions that we are already remanding for a new trial. If the evidence was insufficient, however, Mr. Pendleton is entitled to dismissal of the charges with prejudice.

"Under both the federal and state constitutions, due process requires that the State prove every element of a crime beyond a reasonable doubt." *State v. Johnson*, 188 Wn.2d 742, 750, 399 P.3d 507 (2017). In reviewing a claim for insufficient evidence, appeals courts consider "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion)). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Circumstantial evidence carries the same weight as direct evidence. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004), *abrogated in part on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). "In determining whether the requisite quantum of proof exists, the reviewing court need not be convinced of the defendant's guilt beyond a reasonable doubt, but only that substantial evidence supports the State's case." *State v. Jones*, 93 Wn. App. 166, 176, 968 P.2d 888

(1998).  Appellate courts defer to the fact finder on the resolution of conflicting

testimony, credibility determinations, and the persuasiveness of the evidence.  *Thomas*,

150 Wn.2d at 874-75.

> A.      *Counts III and IV: allegedly insufficient proof that the offenses were*
>          *committed in Washington State*

Mr. Pendleton's third assignment of error challenges the sufficiency of evidence to

prove that the identity thefts charged as counts III and IV were committed in Washington

State.  Those counts dealt with the credit card account with Discover and the bank

account with Bank of America that were opened or reopened in the names of Mr.

Pendleton and Jamie K., respectively.  Where elements of a crime are committed in

different states, "any state where an essential part of the crime has been committed may

take jurisdiction," at least where a state defines jurisdiction by statute.[4]  *State v. Lane*,

112 Wn.2d 464, 470, 771 P.2d 1150 (1989).

Count III:  the Discover account.  Elements the jury was instructed the State was

required to prove beyond a reasonable doubt for count III were

> (1)  That on or about or between January 5, 2015 and November 30, 2015
>      the defendant knowingly used a means of identification or financial
>      information, to-wit: Discover Account ending xxxxx4998, of another
>      person, living or dead, to-wit: Jamie Khrystian Pendleton;
>
> (2)  That the defendant acted with the intent to commit any crime;

---

[4] Washington defines jurisdiction by statute.  *See* RCW 9A.04.030(1) ("A person
who commits in the state any crime, in whole or in part.").

(3)  That the defendant knew that the means of identification or financial information belonged to another person; and

(4)  That any of these acts occurred in the State of Washington.

CP at 231.

A senior field investigator employed by Discover testified at trial and identified trial exhibit P-2, a collection of screen printouts of internal Discover records and statements for a Discover account in the name of Jamie C. Pendleton.  The account was opened online on January 6, 2015.  A Post Falls, Idaho, address was entered as Mr. Pendleton's home address, and Mr. Pendleton lived in Idaho at the time.  While the Discover account was in Mr. Pendleton's name, Jamie K.'s social security number and date of birth were used in place of his own.  Jamie K. testified she never opened a Discover account.

While transactions reflected on the Discover account statements most often occurred in Idaho, the statements reflect a $179.11 charge at a Comfort Inn & Suites in Spokane, Washington, on January 24, 2015.

Mr. Pendleton argues that there is insufficient evidence that he made online application for the account in Washington.  Br. of Appellant at 18-19.  But the jury instructions did not require the State to prove that he opened the account in Washington; they required it to prove that Mr. Pendleton used the account knowing that identification information used for the account belonged to Jamie K.

15

Viewing the evidence and reasonable inferences in the light most favorable to the State, a reasonable jury could find that Mr. Pendleton committed a criminal act described in the instruction between January 5 and November 30, 2015, in the State of Washington.

Count IV:  Bank of America account.  Elements the jury was instructed the State was required to prove beyond a reasonable doubt for count IV were

(1) That on or about January 31, 2016, the defendant knowingly used a means of identification or financial information, to-wit: Bank of America Account ending xxxxx3555, of another person, living or dead, to-wit: Jamie Khrystian Pendleton;

(2) That the defendant acted with the intent to commit any crime;

(3) That the defendant knew that the means of identification or financial information belonged to another person; and

(4) That any of these acts occurred in the State of Washington.

CP at 232.

A custodian of records for Bank of America testified at trial and identified trial exhibit P-3, which was a collection of screen shots of internal bank records and statements for a Bank of America account in the name of Jamie Khrystian Pendleton. The record custodian testified that a checking account was opened under the account number in 2011 and was closed in 2013.  The custodian testified that the address for the account was updated on February 1, 2016, and she identified checking account statements for the account for the period February 1 through July 15, 2016.  The bank's records suggest that a debit card issued on January 31, 2016, accounted for the reactivation.

16

Jamie K. testified that although she opened a Bank of America account many years earlier, the account documented by exhibit P-3 was not an account that she had opened or reactivated.

Mr. Pendleton points out that for this charge, the State was required to prove that he used Jamie K.'s identity *on a particular date*, not a range of dates; it was required to prove that he used it "on or about January 31, 2016."  CP at 232.  The State presented evidence that Mr. Pendleton used the Bank of America debit card to rent a U-Haul trailer in Spokane in March 2016, but it presented no evidence that Mr. Pendleton used the card or account on January 31, 2016, in the state of Washington.  The evidence is insufficient. Mr. Pendleton's conviction for count IV must be reversed and the charge dismissed with prejudice.

> B.     *Counts VI, IX, X, XI, XII and XIII: allegedly insufficient proof that Mr.*
>        *Pendleton, as opposed to another person, committed the alleged criminal*
>        *acts*

Mr. Pendleton's final challenge to his convictions is that the State failed to prove beyond a reasonable doubt that he prepared or presented the documents admitted as exhibits P-5, P-8, P-9, P-10, P-11, and P-12, which account for three of the identity theft charges and the three forgery charges.  These are the forms completed and submitted to the State of Washington Business Licensing Services (Business Licensing Services), and the several documents required by the WSLCB in March, April and May 2016.  Mr. Pendleton argues that his signature does not appear on any of these documents; no one

testified that they saw him prepare the documents or otherwise had personal knowledge that he did so; and

> [t]he only evidence connecting Pendleton to these documents was the testimony that he was instrumental in founding the business and the bar, and that he alone was present at the bar one day when a police officer, fire marshal, and liquor control agent visited.

Br. of Appellant at 21.

Mr. Pendleton identifies Jacqueline as another person who could have committed the alleged criminal acts. He argues that the documents filed online with Business Licensing Services identified her as the preparer and the limited liability company information form submitted at the WSLCB's request on April 27 was signed with her name. He also argues that Jacqueline "is Jamie K.'s grandmother and presumably had as much knowledge of Jamie K.'s identifying information as Pendleton." *Id.* at 22.

Mr. Pendleton understates the State's evidence against him. He admits there was evidence that he was instrumental in founding Pendleton Enterprises and the Daiquiri Factory. Beyond that, however, there was evidence that he was the moving force in attempting to reopen it. Ms. Thompson testified that he coordinated all the paperwork, dispatched forms for signatures as needed, and persuaded her to provide money needed and to help clean up the premises. She testified that neither Jacqueline nor Jamie K. were on site and only she, not they, was involved monetarily. She testified that, according to Mr. Pendleton, Jacqueline and Jamie K. were only needed as "beneficiaries."

18

The same Spokane police officer who encountered only Mr. Pendleton at the bar premises when he, a fire marshal, and a liquor control agent made an inspection also attended a business licensing appeal by Pendleton Enterprises that took place on June 21, 2016.  He testified that Mr. Pendleton was present for the appeal but no other putative owner of the LLC was there.

Ms. Camera and Mr. Lorenz testified that they knew Mr. Pendleton as the tenant of the Daiquiri Factory's premises in the Crescent Building.  Ms. Camera was explicit that she knew him as the tenant for the period when the premises were reoccupied in 2016.

A jury could reasonably infer that because Jamie K. and Mr. Pendleton share the same name, listing Jamie K. as an owner of the business would better enable Mr. Pendleton to participate in the business without raising a red flag.  Contrary to Mr. Pendleton's argument, falsely identifying Jamie K. as an owner is not equally suggestive that Jacqueline was the perpetrator of identity theft.  Jamie K. testified that she had a relationship with Jacqueline, "[w]hen [she] was a child" but denied saying that she maintained a relationship with her.  RP at 469-70.  As of the time of trial, Jamie K. did not know Jacqueline's address.  A father could be expected to have a child's social security number—even an estranged father, who might have paid child support and

19

claimed a child as a dependent—but Mr. Pendleton doesn't explain why Jacqueline would have Jamie K.'s social security number. He doesn't explain why Jacqueline would know Jamie K.'s address if Jamie K. did not know Jacqueline's address.

And given other evidence in the case, Jacqueline's identification as the preparer or signatory on several documents is not compelling defense evidence. The jury was presented with a great deal of evidence that identity theft had been used in an effort to relicense and reopen the Daiquiri Factory. Given Mr. Pendleton's central role and the other wrongdoing committed in pursuit of relicensing, jurors could reasonably infer that he was willing to make applications and attestations in the name of his 70-year-old mother from Houston in order to hide his own, disqualifying, involvement.

The evidence that Mr. Pendleton committed the criminal acts charged is sufficient.

III.    INDIGENCY MUST BE TAKEN INTO CONSIDERATION AT RESENTENCING

Finally, Mr. Pendleton contends that because he is indigent, it was error for the trial court to order him to pay a $200 criminal filing fee and community supervision fees.

"Whenever a person is convicted in superior court, the court may order the payment of a legal financial obligation as part of the sentence." RCW 9.94A.760(1). This is subject to the exception that "[t]he court may not order an offender to pay costs as described in RCW 10.01.160 if the court finds that the offender at the time of sentencing is indigent as defined in RCW 10.101.010(3)(a) through (c)." *Id.*; *see also State v.*

20

*Ramirez*, 191 Wn.2d 732, 746, 426 P.3d 714 (2018). If a defendant is statutorily indigent, then for purposes of imposing costs being able-bodied and capable of being employed is not part of the analysis.

The criminal filing fee imposed by the court is a cost subject to the indigency exception. RCW 36.18.020(2)(h). Mr. Pendleton was found indigent for purposes of his appeal on the basis of a declaration stating he had no annual income, thereby falling within the definition of indigency provided by RCW 10.101.010. As the State concedes, it was error to impose the criminal filing fee.

Supervision fees are governed by RCW 9.94A.703(2)(d), which provides that "[u]nless waived by the court, as part of any term of community custody, the court shall order an offender to . . . [p]ay supervision fees as determined by the [Department of Corrections]." Because supervision fees are waivable, they are discretionary, but they are not a "cost" under RCW 10.01.160 that is prohibited from being imposed on an indigent defendant. *See State v. Spaulding*, 15 Wn. App. 2d 526, 536-37, 476 P.3d 205 (2020).

We reverse Mr. Pendleton's convictions on counts IV, XI, XII and XIII. We remand with directions to dismiss count IV with prejudice, for retrial of counts XI, XII and XIII, and for resentencing for the remaining convictions, which we affirm. In

resentencing Mr. Pendleton, the criminal filing fee shall not be imposed if he remains indigent.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Fearing, J.